All right, so we'll put the 10 minutes on the clock for you. Thank you, Your Honor. Good morning, and may it please the Court. My name is Joshua Tinkoff, a certified law student on behalf of Appellate Norman Daniels, under the supervision of Peter Afrasiabi and the UC Irvine School of Law Appellate Litigation Clinic. I will be reserving five minutes of my time for rebuttal, and I will be watching my clock. Your Honors, this is a very narrow issue. Dismissal at Rule 12b-6 is erroneous, as there is not a sufficient factual record. I'm sorry, I'm going to stop you for a moment. Can you stop the clock? So you want to divide your time, this is what I was asking when we began, between opening and rebuttal, and then have a second rebuttal argument? No, sorry, Your Honor, that's my… So you're taking the full 10 minutes now? Yes, I'm taking the full 10 minutes right now. Thank you. Sorry, Your Honor. Okay, let me start the clock again. This is a very narrow issue. Dismissal at Rule 12b-6 is erroneous due to the fact that there is not a sufficient factual record to conduct a Turner analysis based on these facts. The Court has held that in Tiedman v. Blackensee, a sufficient factual record is required to begin to conduct any sort of Turner analysis on the four-factor Turner test. At this case, we do not have a sufficient factual record. What we do know on this case is that Norman Daniels was at one point allowed to communicate with Mr. O'Neill. He asked to correspond with Mr. O'Neill. They then denied his correspondence. When he asked why this denial happened, they simply cited to 3139-F, a regulation that merely tells the facility the restrictions they can place on speech rather than giving them any sort of mechanism to do so. He sent this appeal multiple times, and multiple times they kept citing to 3139-F. That is the factual record, John. There is no factual record based as to why there was this denial, what Norman Daniels did, what was to happen. All of these facts are essential in conducting a Turner analysis based off of whether or not there was legitimate penological interest to prohibit this speech. Can I ask you a preliminary question? Are you so you filed a replacement or supplemental brief to replace Mr. Daniels' pro se brief, and in the pro se brief he advanced claims for conspiracy and due process violations. And ADA. And ADA. And the replacement brief makes a First Amendment argument. Are all of those issues at play, or are we just dealing with the First Amendment issue? Your Honor, we're not conceding any of the issues that Mr. Daniels alleged in his first brief. However, for our supplemental brief, we chose to focus mainly on the First Amendment claims at this time. But we hold open the other claims as they are. And you were just submitting those claims on his brief? Yes, Your Honor. Without a sufficient factual record, the court cannot begin to conduct this analysis. In Tiedemann v. Blackensee, the court held that they could not begin to determine whether or not 200 minutes was sufficient in prohibiting communication over cell phones, over prison phones. They felt that there was not enough of a record to determine whether or not 200 minutes was sufficient, what minutes would be sufficient, or why they should limit it in the first place. In this case, we have no reason as to why the facility might have limited Mr. Daniels' speech, why they may have denied this, or any of their reasoning set out with it. So is your argument that they have to have a reason and that they also have to notify Mr. Daniel of the reason? Or is it sufficient if they could point to a reason, a penological interest in denying the correspondence? Your Honor, we feel that at a Rule 12 hearing, they must have given a reason or at least point to a penological interest. In this case, there is none. They have not pointed to one, nor have they given a reasoning. At a Rule 12 hearing, as this Court has held, the lights must be construed most liberally to the plaintiff's complaint, especially when they are a pro se plaintiff. But what I'm asking you is, were they – are you arguing that they were also required to notify Mr. Daniel of that reason? Your Honor, we don't feel – we are not arguing that they are necessarily required to notify Mr. Daniels. However, we are arguing that if they are wanting to succeed on a Rule 12 motion to dismiss, they must give a reasoning. In this case, none has been offered. Might give meaning to the Court or give to Mr. Daniels? A Court reasoning would have been sufficient. At this point, we believe they have not done that either. Let me ask you this. If you're right on these points, what happens in qualified immunity? Is there a specific case – and is it Turner – that says you have to point to a reason or give a reason? What's your response to the argument that even if you're right as to a constitutional violation, there still is no clearly established precedent to get around qualified immunity? Well, Your Honor, at this point, the qualified immunity argument is unwarranted. This is – that's an affirmative defense. We're not even at summary judgment, Your Honor. This is at Rule 12b-6 hearings. We're merely trying to state that we need to get to a summary judgment portion, at which point they can bring in these affirmative defenses as they would like to. But at this point, it is premature to bring in these defenses. Well, what is your client seeking? Is he seeking injunctive relief, money damages, or both? Your Honor, at the time of filing, he was seeking injunction. At this point, we are seeking monetary damages for the distress that has caused Mr. Daniels, being an incarcerated individual, having his First Amendment rights limited in this way. So you're no longer advancing a claim for injunctive relief? Your Honor, at this time, an injunctive relief would not be appropriate. Mr. Daniels is not in the facility. I see. Okay. Dismissal at Rule 12b-6 is premature without the factual record. The Court has held this in many different First Amendment cases, Tiedemann v. Blackensee, as pointed out, but as well as also in Ward v. Walsh and Shakur v. Scherrero. This Court has held that when trying to establish a First Amendment argument, they must first have a factual record to begin to conduct this analysis. Looking at what the factual record is, the Court must take the light in favorable – in light most favorable to the plaintiffs, as established by the Supreme Court in Stouse v. Bauer and Haines v. Kerner, as well as also Mr. Daniels being a pro se litigant. The Court must accept plaintiffs' factual allegations as factual and liberally construe them in light, even though they are unartfully pled. This – Mr. Daniels being a pro se litigant was not able to fully artfully pled his case in this matter. However, the facts he stated do hold true, that there was no general ban on speech as proffered by opposing counsel. There was no reason for this denial outside of an arbitrary reasoning. And when asked for a reason, the only statement given by facility and at all points through this proceedings has been citing to 3139F. There was no other factual record given, no basis that they had this denial, merely an arbitrary reason. At this point, Your Honors, there's too many known unknowns to continue to develop an actual record on this case to begin conducting an analysis. Sure. I do want to ask a little bit about the allegation that Mr. Daniels has made clear that he's bringing as applied challenge here, so he's not challenging the actual policy such as it is somewhat vague. And then I think in your briefing you also stated as an as applied claim. So then how does that affect the Turner analysis? What does the defendant have to show to meet Turner? Does it have to show that the reasons for applying the policy to restrict the communication between Mr. Daniels and the other inmate, that that in itself served a legitimate penological interest or just that it complied with the policy? Your Honor, they need to show that as applied, this challenge would suffice to be a penological interest. The regulation they cite to does not create a valid, legitimate ban on speech. Merely it states what they can do to restrict speech. However, it gives no mechanism to do so. So for in this case, we have to look at what was applied, how the regulation was applied, and how they did prohibit the speech. And if they did so, was that related to a legitimate penological interest or was it simply an arbitrary decision made by one of the staff members at the facility? For that case, we need to then look at the factual record of which there is none provided by opposing counsel. So what mechanism do they need to lay out in the regulation? Because regulation talks about restriction of male, right? And says the people to whom it could be restricted, family members, et cetera. But it seems clear it's talking about restricting male. What more do you think they need to advance in the regulation? Well, Your Honor, the regulation proffers no reason for this. They state they can. That is still an arbitrary reason. If they could do that and they feel that whenever they want to, they can, that does not satisfy a Turner analysis. They must still provide a legitimate penological interest. Merely giving permission does not allow for any sort of reasoning behind it. In this case, they have not provided that reasoning. They merely stated we can prevent your speech, so we're going to. If they had a legitimate penological interest but didn't want to tell Daniels what it was, would they satisfy Turner by saying we have an interest, we're not going to tell you what it is, we're not going to let you send this mail, and then when Turner sues, they can present that interest to the court and explain what it is to the court. Would that satisfy Turner? Your Honor, if they've provided a factual record to the court that they can conduct a Turner analysis on, that may be enough to satisfy it. Without knowing the full facts of what the denial was, I can't conduct an analysis. So you're not arguing that they had to tell Daniels, but you're arguing that they never even presented to the court that they've done that analysis, let alone proven that they had a penological interest. Yes, Your Honor. Okay. We are saying that they have not provided any sort of reasoning towards the court, and if they had wanted to at any stage, especially at a Rule 12b-6 hearing, they must give a reason. Otherwise, the court must look at the facts in light most favorable to the plaintiffs. How could they have done that at 12b-6 if the allegation in the complaint is you had no interest? How could they possibly respond to a 12b-6 by presenting what their interest was, given that would be going outside the four corners of the complaint? Your Honor, I seem out of time, if I may answer this question. Going outside the corners of the complaint, they don't necessarily need to give outside the corners of the complaint. I believe opposing counsel has filed three or four different briefs in this matter, and at each point they could have pointed to some sort of penological interest within the facility, some sort of communication that they were interested in, some sort of activity that they were wanting to monitor. And at no point in four different opportunities to do so did they offer anything. They merely stated, we were allowed to do what we did because the regulation allows us to. That is not a legitimate penological interest. That is merely stating that we can, we're going to do it because we simply can. I think to follow up on Judge Simon's point, what you're suggesting is they could have just argued that interest, but then wouldn't you be standing before us and tell us that there's nothing in the record to support that? There needs to be some record evidence, not just counsel's argument. Your Honor, if they had offered, they, Your Honor, at this point, hypothetically speaking, if they had offered any sort of arguments, we could maybe look at whether the credibility of those arguments are sufficient. However, that is a hypothetical because we know for a fact that they haven't. Or maybe they should have just filed a motion for summary judgment if they had an interest. Possibly would have been the appropriate mechanism, Your Honor. All right. Thank you. Thank you, Your Honor. Good morning. May it please the Court, Deputy Attorney General Ari Sheps for defendants. This case concerns inmate-to-inmate correspondence and is directly governed by Turner v. Safely, which the Supreme Court upheld the prison policy that restricted communication between inmates at different institutions, yet provided that discretionary exceptions could be made upon an inmate's request. California's regulation, Section 3139, is nearly identical to the one in Turner. Now, Supreme Court in Turner held that limiting communications between inmates who are not family members or joint litigants is reasonably related to legitimate peniological interest of safety and institutional order. Are you suggesting that's a bright-line rule from Taylor? That means that a correctional facility can always just restrict correspondence under these circumstances? So, yes. We would say that it is a bright-line rule that restricting communications between felons or individuals on parole, sorry, not felons, individuals who are incarcerated, is bright-lined and protected by Turner because of the inherent security concerns, which, as the Court stated, the prohibition on correspondence between institutions is logically connected to these legitimate security concerns. But didn't the Court in Turner list some factors to consider? Yes, the Court did list factors. So why do we consider factors if it's a bright-line rule? Why don't we just say it's correspondence between two inmates, it's done? Well, so the factors allowed in Turner are other sections for limiting all kinds of speech. They're evaluated in multiple contexts, and one of those factors is, is there a legitimate peniological interest? But as it comes to inmate-to-inmate communication, the legitimate peniological interest is inherent in the fact that you have two inmates at different institutions that are communicating. That itself is a safety concern. So are you arguing that or are you saying that Turner holds, among other things, that a prison can always, without more, restrict inmate-to-inmate communications, even at other institutions, without having to show anything, without having to show any particular reason, just because of the inherent nature of inmate-to-inmate communications? They don't have to, and they could allow it, but they could restrict it without showing any more. Is that what you're saying Turner holds? Well, I would say that Turner holds that you don't need additional justifications beyond the inherent safety considerations. And in going with that, I would say if you look at the lower court's decision in Turner, which was then upheld by it, the prison provided the justification that the communication between the Turner and his intending correspondence was not in his best interest. That was not why the Supreme Court, though, upheld the restriction regulation. So it's clear that even if a different explanation is given, thus it's acceptable, it would stand to reason that if no additional explanations are given, it's still reasonable. So what about the fact that they let him have this correspondence before, that he was able to correspond with an inmate in another facility? Why does that not suggest that this is being applied in an arbitrary and inconsistent manner? Well, so there's no requirement under Turner that all prison officials or all institutions apply the same regulations exactly the same way. And indeed, in Turner it was noted that the prison at issue applied its regulation to its inmate population significantly more strict than any other prison. But here, I mean you keep talking about Turner, but here there's nothing in the record that articulates a penological reason for restricting Mr. Daniels' correspondence, correspondence he was allowed to previously pursue. And if there were a blanket penological concern about this correspondence, it would seem that the record should reflect that he was never allowed to do this. But it doesn't show that, and I don't know how you get around that. Well, again, I think it's the fact that different staff members are able to evaluate things differently and are able to interpret. What standards are they using? They're using a number of standards. But in general, what's required from them is simply is there a legitimate penological interest, which is all inherent in Turner. Why isn't that a factual question in this case? This is an as-applied challenge. I think it's certainly from the allegations of the complaint. There is not a categorical ban on all inmate-to-inmate correspondence. So then there has to be, I think the courts have been clear, when you have an as-applied challenge, you cannot have arbitrary or discriminatory application. So then we have sometimes some inmates are allowed to correspond, sometimes they're not. How on this record are we supposed to be able to tell whether the application, the allowance in some cases and disallowance in others, is not arbitrary or discriminatory? Well, first of all, I would say that plaintiff did not – if that was something that plaintiff was going for, he did not properly plead that in his complaint in that, while he does mention that other inmates were given approval, he doesn't provide facts about what those inmate situations were. His complaint was pro se, right? And Ninth Circuit law does require that they be liberally construed. And he does talk about that some inmates could do it and some inmates couldn't. He even says that he was allowed to at one point and then later prohibited. If the prison said, all right, we're going to let you send inmate-to-inmate communication, but not you, and they never explain it, doesn't that violate principles against arbitrary application of rules? Well, I would say, well, yes, while plaintiff was pro se, I mean, just because he is pro se is not a free pass to leave out. But it's a liberal construction pass. Yes, it is a liberal construction, but it still does not allow the court to provide the essential elements, which plaintiff did not provide in this. Let's say we disagree with that reading of the complaint. We find the allegations are specific enough to show that there was at least an inference of arbitrary discriminatory application. How does the defendant meet its burden under Turner on the pleadings in this case? Well, on two factors. One, the fact that in Partiner v. Martinez, which goes into this, the only things that are required for these types of rejections and censorships are notifying the individual, the rejection, the letter, allowing the offer, reasonable opportunity, protest decision, and referring to the complaint, which is what happened here. No, they didn't notify Daniels of why he can't send it. Well, they notified him that his request had been denied. But they never told him why so that he can't tell whether it's arbitrary or not or whether there is or is not a peniological interest that he can contest. But if that was something that he believed he had due process abilities, which he did, which is arguing it before other individuals. And no one ever told him why he was not being allowed to do it now even though he could earlier. But that's not a requirement. What's required is that he had the opportunity to have it reviewed, and he reviewed it under three different prison officials. Even assuming he was not entitled to get a reason from the prison itself, how do you meet your burden now before this court to show that there was a legitimate peniological interest for denying his correspondence request? Well, I would say that, one, I think the inherent peniological interest is just inherent in how Turner holds that prison. So what you're saying is that any time you have an incarcerated person, the facility at which they are detained can deny their First Amendment right to correspond with somebody just because they're an inmate in a facility. I would say that I wouldn't phrase it that way. I would say that – But, I mean, that's the import of what you're suggesting with this bright-line rule, that there doesn't have to be some tie to escape plans, drug smuggling, gang activity. The prison doesn't have to come forward with anything to suggest, look, this is a potential risk and dangerous, and so we're not going to allow it. Instead, they can just say, you're an inmate, so, sorry, you don't get to correspond. I mean, isn't that the import of your bright-line test? I would say that the import of my position is that when – because inmates-to-inmate communication is undoubtedly a spur to further criminal activity inherently. But you allow some, and so that's the problem here, right, is that you haven't said we've made a decision categorically, inmate-to-inmate correspondence. The risk of it leading to criminal activity is too great. We bar it all. I would maybe find that, you know, we could be – we'd be having a different conversation, but here there's some, some that the prison says okay, some that the prison says not okay, with no apparent explanation on this record. How is the dismissal on the pleadings at this point appropriate when the court has said – courts have repeatedly said you can't have arbitrary or discriminatory application of a policy, and that when there's – there can be, you know, essentially a claim that an application is not enforced even handedly. I mean, if under your interpretation they could just – they could say the reason why we're going to – they could have in the back of their minds a secret reason, the reason why I'm denying this inmate is because I'm retaliating against them first amendment rights or because I don't like their religion, and – but never have to say it, and allow some and not others. Well, I would say that's where the due process considerations go, including the fact that they get to have it reviewed by other individuals beyond the first individual. So if there was a situation where one officer was retaliating, that decision gets reviewed by multiple other officers. Right. What if the whole institution chooses to retaliate against him because he files lots of complaints? I think that's a hypothetical that I think is very just outside the norm. I never – I think that – sorry, I think that the standards under Partino are just very clear that what plaintiff is entitled to are the due process protections which he received. And I'd also argue that regardless of all this, based on these decisions, defendants are entitled to qualified immunity because, for the simple fact, that following turn or following – So what's your response to your colleague's opposing counsel's statement that it's premature to consider qualified immunity because that's an affirmative defense and maybe you're right that you'll get qualified immunity down the road, but we're here on a grant of dismissal based on 12B6? Well, this court has the authority to rule on qualified immunity at a first instance. So I think it's irrelevant whether it be procedurally proper, how the district court would handle it. This court has the authority to determine qualified immunity. Is there a case you can point to, a Ninth Circuit case you can point to, where qualified immunity has been applied in response to a 12B6 at this stage? There is not a specific case I can point to. However, as discussed in our brief, it is something the court has the authority to do. I don't have a specific case where it was – But you did not move for summary judgment on the basis of qualified immunity before the district court, correct? No. Okay. So now you're asking us to do that on an undeveloped record and in the first instance. I'm saying this court has the authority to do that, and I'm saying that based on Turner, based on Proctiner, those are – the tenants are entitled to qualified immunity, and that with this court having that authority, it is something that it may consider. Considering the allegations in the light most favorable to the plaintiff, and you have a claim for First Amendment violation of arbitrary or discriminatory application of policy prohibiting inmate-to-inmate communication, I think that, I mean, there's – you would have to say it was not clearly established that a prison can't arbitrarily or discriminatorily suppress an inmate's right to communicate with another inmate. Well, I would say that with qualified immunity, the question is are there cases which would clearly show an officer that their conduct was unlawful. The complaint doesn't allege retaliation. It's not a – this is not a retaliation matter. This is not a – How do we know it's not a retaliation matter? I mean, if the officer wanted to retaliate against someone, Daniels, because he files lots of complaints and everybody in the prison officials knew that, that might very well be a retaliation matter. You would then move for summary judgment for qualified immunity. They'd be entitled to some – plaintiff would be entitled to some discovery to find out why did you do it. And if they could create a disputed issue of fact, a genuine issue of fact on retaliation, you might not get qualified immunity, right? Well, if that was the case, then plaintiff should have pled that. Well, you don't plead a response – you don't have to plead a response to an affirmative defense in an opening complaint, do you? No, but there is no retaliation, or at least from my reading of the complaint, I do not – I mean, obviously, it's a pro se complaint, so they're read differently. But in my reading of the complaint, I do not see an retaliation allegation. I see an arbitrary – I see a violation of this. I don't see any retaliation. So if that is a claim that plaintiff wanted to pursue, he had multiple opportunities to do so. And I guess I would last want to just touch on the case that plaintiff did discuss, Tieterman v. Blackenstein. So one distinction that I wanted to distinguish between that and this case is that in Tieterman, the challenge was based on a 300-minute phone cap, not based on no communication whatsoever. So the key distinction there is that it's very different to say you're allowed to send five letters but not six because obviously there's no safety or security concern in adding additional letter. So Tieterman does not change the rule or the way this case should be evaluated. Additionally, it doesn't concern inmate-to-inmate correspondence. I mean, it may in some instances, but broadly, it just concerned inmate-to-anyone correspondence. So with that, if there are no further questions, we would ask that you affirm the judgment. Thank you. Thank you. Thank you. May it please the Court. Mark Berger, certified student on behalf of Appellant Normal Daniels under supervision, Ghida Frasiabi, UC Irvine School of Law, Appellant Litigation Clinic. The government has stated that this case is identical to Turner or the regulation is identical to Turner, but I would argue that is not the case. Turner was decided with a fully developed factual record. There were testimony from prison officials. Witnesses testified about growing prison gang problem at the prison, as well as the use of the rent facility to provide protective custody for inmates. The case is very distinguishable from a 12B6 dismissal. If the state put out or the prison put out a regulation that says there will be absolutely no prisoner-to-prisoner communications allowed because we are concerned about improper risks, unless you fit within the narrow exceptions of 3139F, where would you be? Would there be a problem then? Well, actually, at rents, the district court found that the rule was practiced, is that inmates were not allowed to, of course. Right, so if they put out a regulation, let's say the regulation would be 3139F star, and it would say no inmate-to-inmate communications, period, unless you meet one of the F1, 2, or 3 exceptions. And that was their uniform, non-arbitrarily enforced practice. What would Turner say about that, if anything? If there is a sufficient factual showing that security concerns or other valid, legitimate, penological reasons at that particular institution justify a complete ban, such as an exacerbating gang violence problem, such as at the Missouri facility, then yes. But that is not the situation we have here, where the prison routinely permitted communication, which is actually facilitated by other regulations that the government conveniently ignores. It says that the inmates may correspond with other inmates, provided that they meet criteria of approval, which is no gang affiliation or participation in a racketeering enterprise. There was no mention of these criteria during the interview process or the review of his file. The only reason we have from the government is subsection F, that provides absolutely no affirmative language guiding officials' discretion or saying what the prisons ought to do. In fact, it limits their discretion. It says what they're not allowed to do. So Daniels asked for approval under one of these other criteria, including no gang affiliation, no contraband, et cetera. And his only response was, sorry, under 3139F we say no. Is that right? And that's what he alleged was the problem. Exactly, and not just once. He was told that seven or eight times in a row. And you can see this outlined in the record, pages 10, 11, 61, 62, 69, 71, 147, 149. There's just plenty of instances, and the only reason was subsection F. In fact, he almost begged for an internal policy, a memorandum, anything the way it was applied. He was previously approved. Your opposing counsel just argued that we should on our own find qualified immunity here. Why shouldn't we? So the Supreme Court and this court repeatedly emphasized that you inconsistently treat a qualified immunity as an affirmative defense. Take, for example, Gomez v. Toledo. The court stated the qualified immunity is a matter of defense to be pleaded by the officials, and the court looks at the existence of reasonable grounds for the belief formed at the time and in light of all the circumstances. Here, the factual record is so deficient and contested as to foreclose any meaningful inquiry into the circumstances surrounding the exercise of discretion. So it's simply premature. Swift v. Lewis says that once a sufficient factual record is developed, the district court should also reconsider whether defendants are immune from damages. So we do not even get there here. The government has not even filed an answer where it would be raised, and we strongly believe that Daniels would still win on the merits. I mean, the record shows how aware they were of this violation. In fact, they previously reversed the use of subsection F with regards to another inmate as a reason for denial, so they knew it was a constitutional violation that was clearly established. Thank you. Thank you, counsel, this morning for your arguments. They were helpful, and congratulations to Mr. Tinkoff and Mr. Berger for, I assume, your first Ninth Circuit arguments. You did a nice job for your client this morning, and thank you for doing that. So this case is submitted, and we're going to take a ten-minute recess before we hear argument in United States v. Ms. Rahi. All rise. This court stands at recess for ten minutes.
judges: BADE, SUNG, Simon